## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AMERICAN BANKERS ASSOCIATION, AMERICAN FINANCIAL SERVICES ASSOCIATION, CONSUMER BANKERS ASSOCIATION, FINANCIAL SERVICES ROUNDTABLE, TEXAS ASSOCIATION OF BUSINESS, TEXAS BANKERS ASSOCIATION, GRAND PRAIRIE CHAMBER OF COMMERCE, GREATER IRVING LAS COLINAS CHAMBER OF COMMERCE, GRAPEVINE CHAMBER OF COMMERCE, LUBBOCK CHAMBER OF COMMERCE, BAY CITY CHAMBER OF COMMERCE, GREATER NEW BRAUNFELS CHAMBER OF COMMERCE, LONGVIEW CHAMBER OF COMMERCE, MCALLEN CHAMBER OF COMMERCE, NORTH SAN ANTONIO CHAMBER OF COMMERCE, PARIS-LAMAR CHAMBER OF COMMERCE, and PORT ARTHUR CHAMBER OF COMMERCE, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; RICHARD CORDRAY, in his official capacity as director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Plaintiffs the Chamber of Commerce of the United States of America (the "Chamber"), the American Bankers Association ("ABA"), the American Financial Services Association ("AFSA"), the Consumer Bankers Association ("CBA"), the Financial Services Roundtable ("FSR"), the Texas Association of Business ("TAB"), the Texas Bankers Association ("TBA"), the Bay City Chamber of Commerce, the Grand Prairie Chamber of Commerce, the Grapevine Chamber of Commerce, the Greater New Braunfels Chamber of Commerce, the Greater Irving Las Colinas Chamber of Commerce, the Longview Chamber of Commerce, the Lubbock Chamber of Commerce, the McAllen Chamber of Commerce, the North San Antonio Chamber of Commerce, the Paris-Lamar Chamber of Commerce, and the Port Arthur Chamber of Commerce (collectively, "Plaintiffs"), which bring this action against Defendants Consumer Financial Protection Bureau (the "CFPB" or the "Bureau") and Richard Cordray in his official capacity as Director of the Consumer Financial Protection Bureau (the "Director"), alleging as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action to challenge the constitutionality and legality of the CFPB's recently issued rule (the "Arbitration Rule" or "Rule") that effectively precludes the use of arbitration agreements in disputes between consumers and providers of consumer financial products and services, instead rendering class-action litigation the default means of resolving such disputes. As explained in detail below, this Rule is invalid and should be set aside for four reasons, each of which is independently sufficient to require invalidation of the Rule. *First*, the Rule is the product of, and is fatally infected by, the unconstitutional structure that Congress gave the CFPB when it created the Bureau in the Dodd-Frank Wall Street Reform And Consumer Protection Act ("the Dodd-Frank Act"). *Second*, the Rule violates the Administrative Procedure Act ("APA") because the CFPB failed to observe procedures required by law when it adopted the conclusions of a deeply flawed study that improperly limited public participation, applied defective methodologies, misapprehended the relevant data, and failed to address key

considerations. *Third*, the Rule also violates the APA for the related reason that it runs counter to the record before the Bureau and fails to take account of important aspects of the problem it purports to address, making it the very model of arbitrary and capricious agency action. And *fourth*, the Rule violates the Dodd-Frank Act because it fails to advance either the public interest or consumer welfare: it precludes the use of a dispute resolution mechanism that generally benefits consumers (*i.e.*, arbitration) in favor of one that typically does not (*i.e.*, class-action litigation).

2.     Congress enacted the strong and long-standing federal policy favoring arbitration almost 100 years ago in the Federal Arbitration Act. The Supreme Court repeatedly has recognized and applied that policy. Consequently, the use of arbitration to resolve consumer disputes has been a common practice for decades. Its benefits are manifold: unlike litigation, arbitration minimizes transaction costs and facilitates speedy and efficient dispute resolution, providing significant advantages to consumers and the public at large. Arbitration gives consumers the ability to bring claims that they could not realistically assert in court, including the small and individualized claims that they care the most about. In contrast, class-action litigation is significantly less effective than arbitration in addressing consumer claims. By definition, class actions are not available to address individualized consumer complaints. And most of the class actions that are initiated lead to no or minimal recovery for absent class members.

3.     In addition, arbitration lowers businesses' costs of resolving disputes, which creates savings that companies can—and do—pass on to customers. These benefits can be realized only when parties are free to enter into arbitration agreements that eliminate the huge attorneys' fees and other litigation costs associated with burdensome class-action litigation.

4.     Against this background, in the Dodd-Frank Act Congress directed the newly-created CFPB to study the use of arbitration in consumer financial contracts, expressly specifying that the Bureau could prohibit or impose limits on the use of arbitration agreements in such contracts *only* if doing so "is in the public interest," "for the protection of consumers," and consistent with the results of the Bureau's study.

5.      The Bureau conducted such a study, and it premised the Arbitration Rule on the study's conclusions. But the study is flawed in many fundamental respects, and—as a result—the Bureau's Rule is fatally flawed as well. The study was the product of a closed process that largely precluded meaningful public comment on the key issues. That failure to engage with knowledgeable stakeholders distorted the Bureau's analysis, evidently with the aim of allowing the Bureau to reach a preordained conclusion—regardless of the evidence. As a result, the study's methodology and approach are fundamentally defective.

6.      The Bureau ignored the data before it that demonstrated both the benefits of arbitration to consumers and the failure of class-action lawsuits to provide consumers with meaningful benefits, while also failing to consider the large volume of additional data that confirms both of those points. The study likewise wholly failed to address key policy questions related to the regulation of arbitration, among them whether a rule mandating the availability of class-action litigation would lead to the complete abandonment of arbitration and, if so, whether the elimination of the only practical method for vindicating individual consumer claims is justified by the interest in encouraging class-action litigation that almost never produces concrete benefits for consumers. As a consequence of these omissions, the Bureau made no serious effort to weigh the *comparative* costs and benefits of implementing a regime that substitutes costly class-action litigation for efficient arbitration.

7.      Unsurprisingly, the substantive conclusions that the Bureau drew from this flawed study, which became the basis for the Arbitration Rule, are arbitrary and irrational. Although the study expressed doubt about the utility of arbitration, the available data—including the evidence recited in the study itself—establish that arbitration is fast and efficient; generally is structured to ensure fair results (with fairness requirements enforced effectively by courts); and produces outcomes for consumers that are at least as favorable as those obtained in litigation. And although the study found class actions to be an effective mechanism for offering consumers relief, the data—again, including that recognized in the study—demonstrate that class members very rarely gain benefits from class-action suits.

- 3 -

8.     Moreover, although the Bureau purported not to eliminate the use of arbitration altogether in the categories of agreements subject to its rule, that will be the inevitable practical consequence of its approach. The Rule prohibits the use of predispute arbitration to limit consumer class-action litigation. Given this limitation, businesses will know that they face the certainty of high litigation costs associated with class-action suits and therefore will not go to the expense of creating an alternative arbitration mechanism—for which business shoulders the lion's share of the costs—in the hope that consumers will opt to use that mechanism after disputes arise. This is especially so because the parties, in any event, would be very unlikely to agree to switch to arbitration once litigation has begun over a particular dispute.

9.     In light of these flaws in the Bureau's analysis, the Arbitration Rule should be vacated and set aside, for the following reasons:

10.     *First*, the portions of the Dodd-Frank Act establishing the CFPB are unconstitutional. The Act gives the Bureau's Director an extraordinary degree of authority that is virtually unique in the federal system, and insulates the Director from control by either the President or Congress. This arrangement violates the U.S. Constitution, both because it shields the Director from accountability to the peoples' elected representatives and because it detracts from the President's Article II authority to execute the laws of the United States. Regulations issued by an agency that is unconstitutionally structured necessarily are the product of, and are infected by, these constitutional defects. The Arbitration Rule, which is the result of this flawed regime, therefore must be vacated and the matter remanded for consideration by an agency constituted in compliance with the Constitution.

11.     *Second*, the Arbitration Rule was adopted in violation of the requirements of the Dodd-Frank Act. Congress directed that the Bureau study the use of arbitration in consumer financial contracts and base any regulation of arbitration on the results of that study. In imposing this mandate, Congress necessarily required the Bureau to conduct a fair, unbiased, and thorough study that was designed to produce reliable and accurate results. But the Bureau did not conduct such a study: instead, it misstated or disregarded key data, reaching palpably invalid

conclusions that understate the demonstrated effectiveness of arbitration and overstate the value of class-action litigation. Such a study did not, and could not, answer the question whether prohibiting arbitration in a significant category of cases would benefit the public. The Bureau's production of a study that failed to comport with Congress's direction, and its decision to premise the Arbitration Rule on the results of that defective study, require that the Rule be set aside.

12.    *Third*, the Bureau's decision to issue the Arbitration Rule was an arbitrary and capricious action within the meaning of the Administrative Procedure Act. The Bureau failed to address key considerations—among them, whether effectively eliminating arbitration in contracts subject to the CFPB's jurisdiction would injure consumers. And the Rule is premised on conclusions that run counter to the administrative record before the Bureau, which establishes that arbitration *is* effective in providing relief to consumers and that class-action litigation generally *is not*. A Rule that disregards relevant considerations and draws illogical and poorly explained conclusions from the evidence before the agency must be invalidated.

13.    *Fourth*, the Arbitration Rule departs from the requirements of the Dodd-Frank Act because it is not "in the public interest and for the protection of consumers." The Rule effectively precludes use of an arbitration mechanism that provides the *only* realistic method by which consumers may obtain relief for the types of individualized claims that they typically regard as most important. And it does so in the interest of encouraging class-action litigation, a procedure that provides substantial rewards to class-action lawyers but almost *never* produces meaningful relief for individual consumers. Such a regulation, which eliminates a demonstrably effective method of dispute resolution while making it impossible for businesses to pass on the cost savings achieved through use of arbitration, neither advances the public interest in general nor protects consumers in particular.

14.    If the Rule goes into effect, it will inflict immediate, irreparable injury on Plaintiffs. Providers of consumer financial products and services will incur significant legal and compliance costs in adapting their businesses to the new rule; the vast majority of these costs will be wasted, and not recoverable, if the Rule ultimately is deemed to be contrary to law. And

so long as the effects of the Rule are being felt, providers of such services will both be denied the benefits of arbitration and exposed to expensive class-action litigation.

15.     Accordingly, Plaintiffs respectfully request entry of a judgment vacating and setting aside the Arbitration Rule. They also request entry of orders staying the implementation of the Rule pending the conclusion of judicial review and enjoining the Bureau and the Director from enforcing the Arbitration Rule.

## PARTIES

16.     Plaintiff Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country, including many members in Texas. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. For decades, the Chamber has filed lawsuits against federal regulators to challenge the legality of anti-business regulations that violate the legal rights of its members and the entire business community. Chamber members and their subsidiaries affected by the Arbitration Rule include financial institutions, financial services firms, and other entities that provide consumer financial products and services and therefore are "covered persons" directly subject to the Rule. Many of these members will be harmed by the Rule, and they will incur significant compliance and other costs as a result of the Rule, in particular because of the Rule's effective elimination of arbitration as a means to resolve disputes. The Chamber is incorporated and headquartered in Washington, District of Columbia. The Chamber brings this action on behalf of its members and the broader business community.

17.     Plaintiff American Bankers Association ("ABA") is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $13 trillion banking industry and its million employees. ABA members are located in each of the fifty States and the District of Columbia, including Texas,

and include financial institutions of all sizes and types, both large and small. ABA members hold a substantial majority of domestic assets of the banking industry of the United States and are leaders in all forms of consumer financial services. The ABA's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed.

18.     Plaintiff American Financial Services Association ("AFSA"), founded in 1916, is the national trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA's more than 400 members provide consumers with many kinds of credit, including traditional installment loans, direct and indirect vehicle financing, mortgages, payment cards, and credit for non-vehicle retail customers. AFSA's members range from large, national companies to small, family-owned businesses. AFSA's members, including its members in Texas, include finance companies, banks, and other businesses that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed.

19.     Plaintiff Consumer Bankers Association ("CBA") is a non-profit corporation and the only national trade association representing the retail banking industry—banking services geared toward consumers and small business. Established in 1919, the association is a leading voice in the banking industry and Washington, representing members who employ nearly two million Americans, extend roughly $3 trillion in consumer loans, and provide $270 billion in small business loans. CBA's membership includes financial institutions that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed.

20.      Plaintiff Financial Services Roundtable ("FSR") represents 100 integrated financial services companies, including Texas companies, providing banking, insurance, and investment products and services to the American consumer. Member companies participate through the Chief Executive Officer and other senior executives nominated by the CEO. FSR member companies provide fuel for America's economic engine, accounting directly for $98.4 trillion in managed assets, $1.1 trillion in revenue, and 2.4 million jobs. FSR's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed

21.      Plaintiff Texas Association of Business ("TAB") is the state chamber of commerce for Texas, advocating for policies favorable to businesses on behalf of Texas employers and businesses of all sizes and representing more than 4,000 business members and their over 600,000 employees at the state and federal levels. On the federal level, TAB works to promote a national-affairs agenda aimed at improving the climate for employers, so their employees may thrive. The Rule is directly contrary to TAB's goal of minimizing the regulatory burdens faced by Texas employers. Many of TAB's members are financial institutions, financial services firms, and other entities that provide consumer financial products and services and are "covered persons" subject to the Arbitration Rule. Many of these members will be affected by the Rule, and they will incur significant compliance and other costs as a result of the Rule, in particular the Rule's effective elimination of arbitration as a means to resolve disputes. TAB brings this action on behalf of its members and their broader business community. TAB is incorporated in Texas and is headquartered in Austin, Texas.

22.      Plaintiff Texas Bankers Association ("TBA") is the oldest and largest state bank trade association in the United States. TBA represents over eighty percent of the 458 banks and savings banks operating in Texas as well as the majority of the 55 out-of-state banks doing business in Texas. All of TBA's members provide consumer financial products and services and

thus are considered "covered persons" subject to the Rule. Many TBA members currently have arbitration clauses in their contracts. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. TBA is incorporated in Texas and headquartered in Austin.

23.     Plaintiff Grand Prairie Chamber of Commerce ("Grand Prairie Chamber") is a non-profit membership organization of businessmen and women who are investing their resources in community development programs, working together to promote, strengthen, and expand the business community of Grand Prairie. The Grand Prairie Chamber partners with business, civic, and educational leaders in Grand Prairie with the goal of building a community where businesses flourish, education is continuing to improve, and the community enjoys a safe and friendly environment. Among many other things, the Grand Prairie Chamber seeks to protect the interests of its members with respect to local, state, and national regulation that may affect the business community in Grand Prairie. Its membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as fast, fair, and efficient means to resolve disputes will be harmed. The Grand Prairie Chamber is incorporated in Texas and has its headquarters in Grand Prairie, Texas, in Dallas County and within the Dallas Division of the U.S. District Court for the Northern District of Texas. The Grand Prairie Chamber brings this action on behalf of itself and its members.

24.     Plaintiff Greater Irving-Las Colinas Chamber of Commerce ("Irving-Las Colinas Chamber") is a non-profit membership organization accredited by the Chamber that represents the interests of the business community in the Greater Irving and Las Colinas, Texas areas. The Irving-Las Colinas Chamber works to promote the growth and development of the business community in Greater Irving and Las Colinas by, among other things, providing businesses with the resources and connections to thrive in the region, hosting networking and infor-

mational events, and advocating for policies favorable to business development and advantageous to consumers. The Irving-Las Colinas Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The Irving-Las Colinas Chamber is incorporated in Texas and has its headquarters in Las Colinas, Texas, in Dallas County and within the Dallas Division of the U.S. District Court for the Northern District of Texas. The Irving-Las Colinas Chamber brings this action on behalf of its members.

25.     Plaintiff Grapevine Chamber of Commerce ("Grapevine Chamber") is a non-profit, voluntary organization of 1,300 business investing their time and money to improve the economic, civil, and cultural well-being of the Grapevine, Texas area. The Grapevine Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The Grapevine Chamber is incorporated in Texas and has its headquarters in Grapevine, Texas, in Tarrant County and within the U.S. District Court for the Northern District of Texas. The Grapevine Chamber brings this action on behalf of itself and its members.

26.     Plaintiff Lubbock Chamber of Commerce ("Lubbock Chamber") is a non-profit membership organization accredited by the Chamber that represents over 2,000 member businesses, who in turn employ over 79,000 workers, in Lubbock, Texas, and West Texas. The Lubbock Chamber advocates on behalf of its members on the local, state, and federal levels to promote policies favorable to businesses and advantageous to consumers in the Lubbock and West Texas areas. It also hosts business development, community relations, and marketing events oriented toward providing member businesses with valuable networking opportunities and learning experiences to further support their growth and development. The Lubbock Chamber's

membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The Lubbock Chamber is incorporated in Texas and has its headquarters in Lubbock, Texas, within the U.S. District Court for the Northern District of Texas.

27. Plaintiff Bay City Chamber of Commerce ("Bay City Chamber") serves to promote and advance the interests of the Bay City business and agricultural communities. It accomplishes these goals by encouraging growth of existing businesses and industries, providing assistance to new firms or individuals seeking to locate in Bay City, and advocating legislative and political actions beneficial to the business or general community. The Bay City Chamber also supports and encourages those cultural and civic activities that improve or expand the quality of life in Bay City. The Bay City Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The Bay City Chamber brings this action on behalf of itself and its members.

28. Plaintiff Greater New Braunfels Chamber of Commerce ("New Braunfels Chamber") serves to promote the civic and commercial progress of the Greater New Braunfels area by advocating for initiatives that are in the best interests of the entire business community. The New Braunfels Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The New Braunfels Chamber brings this action on behalf of itself and its members.

29.    Plaintiff Longview Chamber of Commerce ("Longview Chamber") is a voluntary organization of businesses and professional men and women who have joined together for the betterment of business, development of tourism, development of downtown Longview, and the overall quality of life in Longview and the surrounding area. The Longview Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The Longview Chamber brings this action on behalf of itself and its members, in order to advance the interests of its members.

30.    Plaintiff McAllen Chamber of Commerce ("McAllen Chamber") serves its members, community, and visitors by enhancing economic growth and quality of life through leadership, marketing, and collaborative partnerships. With more than 2,000 members, the McAllen Chamber actively helps to expand and grow the business community in the area. The McAllen Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The McAllen Chamber brings this action on behalf of itself and its members.

31.    Plaintiff North San Antonio Chamber of Commerce ("North San Antonio Chamber") serves to strengthen members' businesses and the community in San Antonio and Bexar County through the delivery of advocacy, networking, recognition, leadership, and professional development programs. The North San Antonio Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and

efficient means to resolve disputes will be harmed. The North San Antonio Chamber brings this action on behalf of itself and its members.

32.    Plaintiff Paris-Lamar Chamber of Commerce ("Paris-Lamar County Chamber") seeks to lead the way for economic growth in Lamar County by promoting and meeting the needs of business, industry, and tourism. The Paris-Lamar County Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The Paris-Lamar County Chamber brings this action on behalf of itself and its members.

33.    Plaintiff Port Arthur Chamber of Commerce ("Port Arthur Chamber") is a membership organization of business and community representatives that works together as a team to advocate for enhanced educational opportunities, infrastructure improvements, the creation of jobs, and a positive vision for the future for the Port Arthur area and surrounding communities. The Port Arthur Chamber's membership includes financial institutions, financial services companies, and other companies that are "covered persons" directly subject to the Rule. As a result of the Rule, those members will incur significant compliance and other costs, and their efforts to use arbitration with their customers as a fast, fair, and efficient means to resolve disputes will be harmed. The Port Arthur Chamber brings this action on behalf of itself and its members, in order to advance the interests of its members.

34.    Plaintiffs have standing to pursue this action on behalf of their respective members under the three-element test enunciated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because (i) one or more of Plaintiffs' members would otherwise have standing to sue in their own right; (ii) the interests at stake in this case are germane to Plaintiffs' organizational purposes; and (iii) neither the claims asserted nor the relief requested requires the participation of individual members.

35.     Defendant Consumer Financial Protection Bureau ("CFPB" or the "Bureau") promulgated the Arbitration Rule at issue in this case. The CFPB's business address is 1275 First Street, NE, Washington, District of Columbia 20002.

36.     Defendant Richard Cordray (the "Director") is the Director of the Consumer Financial Protection Bureau and approved promulgation of the Arbitration Rule in that capacity. The Director's business address is 1275 First Street, NE, Washington, District of Columbia 20002. The Director is sued in his official capacity only.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction over the parties to and subject matter of this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution of the United States and a federal statute—the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

38.     In addition, provisions of the Administrative Procedure Act, 5 U.S.C. § 705, and the All Writs Act, 28 U.S.C. § 1651, grant this Court authority to enter preliminary relief to preserve the status quo pending its review of the merits of Plaintiffs' claims.

39.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because this is a civil action against officers of the United States acting in their official capacity, Plaintiffs Grand Prairie Chamber of Commerce, Grapevine Chamber of Commerce, Greater-Irving Las Colinas Chamber of Commerce, and Lubbock Chamber of Commerce reside in this district, and no real property is involved in the action. Venue is proper in this division because Plaintiffs Grand Prairie Chamber of Commerce and Greater Irving-Las Colinas Chamber of Commerce both reside in this Division.

## BACKGROUND AND FACTUAL ALLEGATIONS

### Article II of the Constitution, the Dodd-Frank Act, and the CFPB's Aberrant Structure

40.     The U.S. Constitution provides that "[t]he executive Power [of the United States] shall be vested in a President of the United States of America." Art. II, § 1, cl. 1. As the Supreme Court has explained, quoting James Madison's statement "on the floor of the first Congress, 'if any power whatsoever is in its nature Executive, it is the power of appointing,

- 14 -

overseeing, and controlling those who execute the laws.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 Annals of Cong. 463 (1789)). Accordingly, although the Court has "upheld limited restrictions" on the President's authority to remove executive branch officials, it has rejected limits on presidential removal authority that would result in an agency "that is not accountable to the President, and a President who is not responsible for the [agency]." *Id*. at 495. Generally speaking, such an agency structure is impermissible, at least when the agency is directed by a single executive branch officer, because it "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Id*. at 498. That result is "incompatible with the Constitution's separation of powers." *Id*. *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 26, 30-32 (D.C. Cir. 2016), *reh'g en banc granted, order vacated*, Feb. 16, 2017.

41.    It was in this constitutional setting that Congress, in 2010, created the Consumer Financial Protection Bureau as one of the newest agencies in the federal government. Congress took that step in Title X of the Dodd-Frank Act. *See* Pub. L. No. 111-203, tit. X, 124 Stat. 1376, 1955 (2010) ("Dodd-Frank Act").

42.    The Dodd-Frank Act purports to establish the Bureau as an independent agency within the Federal Reserve System. *See* 12 U.S.C. § 5491(a).

43.    The Bureau is headed by a sole Director, who is appointed by the President and confirmed by the Senate. *See id.* § 5491(b).

44.    The Director serves for a term of five years. *Id.* § 5491(c)(1).

45.    The Dodd-Frank Act, however, imposes significant limits on the President's authority to oversee the Director, who the President may remove from office only "for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 5491(c)(3).

46.    In addition to this substantial independence from presidential oversight, the Director possesses extraordinarily broad power to, among other things: issue binding rules, not just under the Dodd-Frank Act but also under eighteen other federal statutes (*id.* § 5512(b)(1)); conduct examinations of covered persons and entities for the purpose of assessing their compli-

ance with federal consumer financial laws (*id.* §§ 5514(b)(1), 5515(b)(1), 5516); issue "civil investigative demand[s]" to persons believed to have information relevant to a violation of federal consumer financial laws (*id.* § 5562(c)); institute enforcement actions and conduct "hearings and adjudication proceedings" (*id.* § 5563(a)); and bring lawsuits in state or federal court to enforce federal consumer financial laws (*id.* § 5564).

47.    Moreover, the Bureau's authority is not limited to financial services companies. Every business (other than those falling within limited express exceptions) that provides any of ten broad categories of products and services specified in the Dodd-Frank Act is subject to the regulatory jurisdiction of the CFPB. *Id.* § 5481(15).

48.    The Bureau has other novel features that further insulate it from oversight by, and accountability to, the legislative branch of the federal government. It is not funded through regular congressional appropriations; instead, each year, the Federal Reserve is required to "transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau." *Id.* § 5497(a)(1). The Dodd-Frank Act authorizes the Director to request up to 12% of the Federal Reserve's operating expenses in 2009, indexed for inflation. *Id.* § 5497(a)(2). In 2017, that amounted to almost $650 million.

49.    These characteristics make the Bureau exceptional in the federal system. Most other independent regulatory agencies are headed by bipartisan, multi-member bodies; when a department or agency is headed by a single individual, that person almost always serves at the pleasure of the President; and most components of the federal government (including Congress and the Office of the President) must obtain spending authority through annual appropriations laws. *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d at 18-21. As a consequence, the CFPB is almost unique among federal agencies in the extent that it is insulated from control by elected officials in the executive and legislative branches.

**The Federal Arbitration Act and Congress's Strong Endorsement of
Dispute Resolution Through Arbitration**

50.     The U.S. Supreme Court has stated time and again that Congress, in the
Federal Arbitration Act ("FAA"), implemented "an emphatic federal policy in favor of arbitral
dispute resolution." *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (per
curiam) (quoting *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam)) (in turn quoting
*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). The FAA
mandates that, except where certain limited grounds for invalidating arbitration agreements exist,
those agreements must be "'rigorously enforce[d]' * * * according to their terms." *Am. Express
Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (quoting *Dean Witter Reynolds, Inc. v.
Byrd*, 470 U.S. 213, 221 (1985)).

51.     As the Supreme Court has explained, "Congress, when enacting this law
[the FAA], had the needs of consumers, as well as others, in mind." *Allied-Bruce Terminix
Companies, Inc. v. Dobson*, 513 U.S. 265, 280 (1995). "The advantages of arbitration [for
consumers] are many: it is usually cheaper and faster than litigation; it can have simpler proce-
dural and evidentiary rules; it normally minimizes hostility and is less disruptive of ongoing and
future business dealings among the parties; [and] it is often more flexible in regard to scheduling
of times and places of hearings and discovery devices." *Id.* (quoting H.R. Rep. No. 97-542, at 13
(1982)).

52.     Indeed, as the Supreme Court has recognized, the accessibility and effi-
ciency of arbitration is often the only thing that makes vindicating a consumer claim economical-
ly rational. Without the possibility of arbitration, the Court has explained, "the typical consumer
who has only a small damages claim (who seeks, say, the value of only a defective refrigerator or
television set)" would be left "without any remedy but a court remedy, the costs and delays of
which could eat up the value of an eventual small recovery." *Allied-Bruce Terminix Companies*,
513 U.S. at 281.

53.     Thus, as Dean Peter Rutledge has observed, without access to arbitration,
consumers would be "far worse off, for they would find it far harder to obtain a lawyer, find the

cost of dispute resolution far more expensive, wait far longer to obtain relief and may well never see a day in court." Peter B. Rutledge, *Who Can Be Against Fairness? The Case Against the Arbitration Fairness Act*, 9 Cardozo J. Conflict Resolution 267, 267 (2008).

54.     Consistent with the longstanding presumption against implied repeals of statutes (*Morton v. Mancari*, 417 U.S. 535, 551 (1974)), the Supreme Court has explained that the FAA's mandate that arbitration agreements be "enforce[d] * * * according to their terms" can be displaced only by an express "'contrary congressional command'" in another federal statute. *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). If another statute is "silent" on the question of arbitration, the FAA generally controls. *Id.* at 104. Thus, in the absence of an express statutory mandate to regulate arbitration, a federal agency lacks the authority through regulation to make arbitration agreements unenforceable.

**The Bureau's Limited Authority to Regulate Arbitration**

55.     Against this background understanding of limits on federal agency authority to restrict arbitration, the Dodd-Frank Act provides that the Bureau may issue a rule "prohibit[ing] or impos[ing] conditions or limitations on the use of an agreement between a covered person and a consumer for a consumer financial product or service providing for arbitration of any future dispute between the parties" only in defined circumstances and when specified conditions are met. *Id.* § 5518(b).

56.     In particular, the Act requires the Bureau, before issuing any such rule, to "conduct a study of" and "provide a report to Congress concerning, the use of agreements providing for arbitration of any future dispute between covered persons and consumers in connection with the offering or providing of consumer financial products or services." *Id.* § 5518(a).

57.     Under the Act, the Bureau is authorized to regulate or restrict the use of predispute arbitration agreements if, and only if, it finds that "a prohibition or imposition of

- 18 -

conditions or limitations [on predispute arbitration agreements] is in the public interest and for the protection of consumers." *Id.* § 5518(b).

58.    The Act further requires that the Bureau's findings regarding whether its rule is in the public interest and for the protection of consumers "be consistent with the study" mandated by the Act. *Id.*

59.    The Act also requires the Bureau, in promulgating an arbitration rule, to consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule"; "the impact of proposed rules on" smaller banks, savings associations, and credit unions; and "the impact on consumers in rural areas." *Id.* § 5512(b)(2)(A).

### The Bureau's Opaque and Flawed Study Process

60.    The Bureau commenced the arbitration study process mandated by the Dodd-Frank Act in April 2012, with a Request for Information soliciting suggestions on the appropriate scope, methods, and sources of data for the study. Request for Information Regarding Scope, Methods, and Data Sources for Conducting Study of Pre-Dispute Arbitration Agreements, 77 Fed. Reg. 25,148 (Apr. 27, 2012).

61.    Following this initial Request For Information, however, the Bureau failed to engage meaningfully with the general public for the entire remainder of the study period. The Bureau never informed the public of the topics it had decided to study and never sought public comment on them, even though a number of commenters had suggested that the Bureau utilize that procedure. The Bureau never convened public roundtable discussions on key issues, as many other agencies routinely do. And although the Bureau published the study's "Preliminary Results" in December 2013, it never sought public input on them.

62.     Plaintiffs and other interested parties repeatedly asked the Bureau for additional opportunities to provide feedback on the study process.

63.    For example, in June 2012, the Chamber urged the Bureau to prepare and publish a draft study plan describing the substantive issues to be addressed in the study, to

employ roundtables with interested stakeholders, and to solicit additional input on its draft conclusions before releasing its final study. *See* Letter from David Hirschmann & Lisa Rickard to Monica Jackson 3-4, *Re: "Request for Information Regarding Scope, Methods, and Data Sources for Conducting Study of Pre-Dispute Arbitration Agreements*," Docket No. CFPB-2012-0017 (June 22, 2012), https://goo.gl/Jzb4to.

64.     The ABA, the CBA, and the FSR also recommended that the Bureau "follow an open and transparent process in connection with subsequent phases of the Study," including "disclosure of the empirical research being undertaken, the research standards being utilized, and the persons or entities conducting the research." Letter from Nessa Feddis, Steven Zeisel & Richard Whiting to Monica Jackson 12, *Re: "Comments on Request for Information Regarding Scope, Methods, and Data Sources for Conducting Study of Pre-Dispute Arbitration Agreements (Docket No. CFPB-2012-0017)*," Docket No. CFPB-2012-0017 (June 22, 2012), https://goo.gl/RqFZ5r.

65.     The Chamber echoed its request for additional public input in a supplemental letter submitted in December 2013. *See* Letter from David Hirschmann & Lisa Rickard to Monica Jackson 2-3 & n.5, *Re: "Request for Information Regarding Scope, Methods, and Data Sources for Conducting Study of Pre-Dispute Arbitration Agreements*," Docket No. CFPB-2012-0017—Supplemental Submission (Dec. 11, 2013), https://goo.gl/G3HD7h.

66.     Members of Congress similarly requested more transparency in the study process. On March 22, 2013, the Chairmen of the House Financial Services and Judiciary Committees, together with the Chairmen of the relevant Subcommittees of those Committees, wrote to David Silberman, the Bureau's Associate Director for Research, Markets, and Regulations. Their letter pointed out that "[n]early eleven months [had] passed since the Bureau first sought suggestions from the public about the appropriate scope of its forthcoming arbitration study, as well as appropriate methods and sources of data," and urged the Bureau "to solicit additional public input and comment in the process." The Chairmen also sought answers to nine specific questions regarding the Bureau's study process.

67.     The Bureau's response to this letter conspicuously ignored the request for additional opportunities for public comment. It answered only two of the nine questions—refusing to provide any information regarding the Bureau's study methodology and time line, among other categories of information requested by Congress.

68.     Despite requests for additional engagement from the Chamber, members of Congress, and many others, the Bureau did not request any additional public comments before it published its final Arbitration Study in March 2015. *See* Consumer Fin. Protection Bureau, *Arbitration Study: Report to Congress 2015* (Mar. 2015), https://goo.gl/wcKw1f ("Final Study").

69.     Further underscoring the Bureau's avoidance of transparency and unwillingness to engage all sides of the issue, the final study discussed several topics that had not been included in the Preliminary Results, allowing these subjects to entirely escape informed public discussion and comment.

70.     After the Bureau's release of the final study, the ABA, the AFSA, the CBA, the FSR, and the Chamber asked the Bureau to solicit public comment on the study's findings prior to initiating a rulemaking on arbitration. *See* Letter from the American Bankers Ass'n et al. to Richard Cordray 2, *Re: Comment on CFPB Arbitration Study* (May 21, 2015), https://goo.gl/7Tm7Ks.

71.     Many members of Congress also urged the Bureau to offer additional opportunities for public input prior to any rulemaking. Thirteen Senators and sixty-one Representatives wrote to the Director, complaining that "[t]he Bureau ignored requests from senior Members of Congress for basic information about the study preparation process. The Bureau also ignored requests to disclose the topics that would be covered by the study, and failed to provide the general public with any meaningful opportunities to provide input on the topics. Because the materials were kept behind closed doors, the final *Arbitration Study* included entire sections that were not included in the preliminary report that was provided to the public." Letter from Patrick McHenry & Tim Scott to Richard Cordray 1, *Re: Comment on CFPB Arbitration Study* (June 17, 2015), https://goo.gl/MhyHZ8. These members called on the Bureau to "reopen the study

process, seek public comment, and provide the necessary cost-benefit analysis for understanding how a similarly situated consumer would fare in arbitration versus a lawsuit." *Id.* at 2. And they made clear that "[a]ny rulemaking proceeding in the absence of such minimally fair procedures would be premature, biased, and fail to comply with Congress's intent in conferring this authority on the Bureau." *Id.*

72.     These requests fell on deaf ears: the Bureau did not seek public comment on the findings of the study before it issued the Arbitration Rule.

### The Defective Arbitration Study

73.     Given the flawed process that produced it, it is unsurprising that the final study was fatally flawed in numerous respects: it used defective methodologies; failed to address key questions; and drew the wrong conclusions from the available data. In particular, the study attempted to assess the relative efficacy of arbitration and private class actions as means of resolving consumers' disputes with financial service providers. But its analysis of each subject is demonstrably incomplete or wrong.

### A.     The Study Understated the Value Of Arbitration As An Effective Means of Obtaining Redress for Consumer Injuries

74.     In both its study and subsequent explanation of the proposed rule, the Bureau avoided any clear conclusion about arbitration's utility—but it suggested various reasons why arbitration might not be an effective means for consumers to obtain redress for violations of consumer protection laws. The Bureau thus ultimately stated that it "does not believe that, based on the evidence currently available to the Bureau, it can determine whether the mechanisms for arbitration of individual disputes between consumers and providers of consumer financial products and services * * * are more or less fair or efficient in resolving these disputes than leaving these disputes to the courts." Arbitration Agreements, 81 Fed. Reg. 32,830, 32,855 (May 24, 2016) (the "Proposed Rule").

75.     This skeptical view of arbitration, however, is inconsistent with the evidence, including that in the CFPB's own study, which shows that arbitration provides a fair and efficient mechanism for the resolution of consumer disputes.

76.     In fact, the Bureau's study itself recognizes that arbitration is structured to proceed cheaply and efficiently, offering an effective mechanism for the resolution of consumer disputes. Among other things, arbitration typically requires consumers to pay only a low filing fee ($200 for the service considered in the Study), making it an inexpensive process to initiate. Final Study § 2.5.10 at 85 n.126, § 4.3, at 11. Companies often pay this fee, as well as the entire cost of the arbitration. Arbitrations also are resolved much more quickly than litigation and do not require counsel, which further helps to keep costs down. *Id.* § 4.3, at 11; § 5.7.5 at 75 n.128. Even if lawyers are involved, the individual client retains more control over the direction of the case, as less technical knowledge is required to understand the procedure. *Id.* § 4.1, at 6-7 & n.21, § 4.2, at 8-9; § 4.4, at 13. And arbitrations also generally take place in locations convenient to the consumers. *Id*. § 5.7.2, at 70-71. Thus, the Bureau's study concluded that individual arbitrations "proceed[] relatively expeditiously, * * * the cost to consumers * * * is modest, and at least some consumers proceed without an attorney." *Id*. § 5 at 29, 71-73.

77.     In addition, the Bureau stated, "those consumers who do prevail [in arbitration] may obtain substantial individual awards," with an average recovery by prevailing consumers of "nearly $5,400." Arbitration Agreements, 82 Fed. Reg. 33,210, 33,252 (July 19, 2017); *see* Arbitration Study § 5 at 13. In fact, data in the study suggest that "arbitration seems to generate *comparable or even slightly better results* for individual claimants than do individual consumer lawsuits." Jason Scott Johnston & Todd Zywicki, *The Consumer Financial Protection Bureau's Arbitration Study: A Summary and Critique*, Mercatus Working Paper, Mercatus Center at George Mason University, Arlington, VA (Aug. 2015), at 25-27 (reviewing study data).

78.     This conclusion is consistent with that established by virtually all other relevant data, which show that arbitration is at least as likely, and often more likely, to result in positive outcomes for plaintiffs than does litigation in court. For example, a 2010 study by scholars Christopher Drahozal and Samantha Zyontz of claims filed with the American Arbitration Association ("AAA") found that consumers win relief 53.3% of the time. Christopher R. Drahozal & Samantha Zyontz, *An Empirical Study of AAA Consumer Arbitrations*, 25 Ohio St. J.

on Disp. Resol. 843, 896-904 (2010). That compares favorably with the success rate of plaintiffs in state and federal court, who prevail roughly 50% of the time. *See, e.g.,* Theodore Eisenberg et al., *Litigation Outcomes in State and Federal Courts: A Statistical Portrait*, 19 Seattle U. L. Rev. 433, 437 (1996) (observing that in 1991-92, plaintiffs won 51% of jury trials in state court and 56% of jury trials in federal court, while in 1979-1993 plaintiffs won 50% of jury trials). Another study by the two authors found that consumers prevailed *as or more often* in debt collection arbitration than in court—although in 2010 the AAA imposed a moratorium on debt collection arbitrations in part at the urging of self-described consumer advocates. *See* Christopher R. Drahozal & Samantha Zyontz, *Credit Claims in Arbitration and in Court*, 7 Hastings Bus. L.J. 77, 80 (2011). And a 2005 study by Ernst & Young LLP examining sample case files involving consumer-initiated cases filed with the AAA concluded that consumers prevailed more often than did businesses—55% of the time—and received a favorable result (including outcomes like settlements) almost 80% of the time. Ernst & Young, *Outcomes of Arbitration: An Empirical Study of Consumer Lending Cases* (2005).

79.     In nevertheless minimizing the value of arbitration, the Bureau emphasized what it regarded as the small number of arbitration cases that proceeded to resolution during the study period. The study thus found that in the financial product markets studied by the Bureau, consumers filed 1,234 individual arbitrations with the AAA during the period 2010-2012. *See* Final Study § 5, at 19-20; § 6 at 28 tbl. 6. And it found that only 2.1% of consumers in a survey responded that they would pursue legal action if they were unable to get an unjustified fee removed from their credit card statement by contacting customer service. *See id.* § 3, at 18.

80.     The Bureau, however, failed to mention—much less analyze—the extent to which arbitration creates incentives for companies to settle individual claims or disputes *before* the filing of a formal arbitration proceeding. Because businesses subsidize most or all of the costs of arbitration—under AAA consumer rules, for example, a business must cover at least $1,500 in filing fees (AAA Consumer Arbitration Rules at 34, https://goo.gl/sWZ931)—it is economically rational for every business that is subject to an arbitration provision to settle

disputes of less than $2,000-$5,000 before an arbitration is commenced. That incentive is absent when a consumer is relegated to court, because the cost of bringing suit and conducting the litigation falls on the consumer.

81.     Moreover, many arbitration agreements contain provisions that require bonus payments to customers who do better in arbitration than a company's last settlement offer (providing, for example, that the customer will be awarded a minimum amount, often $5,000-$10,000, plus attorneys' fees if applicable and other costs). It is thus a straightforward matter of economics that, if a consumer has a dispute with a company involving less than the potential minimum payment—and the claim is not frivolous or abusive—the company has every reason to settle before formal arbitration proceedings commence by offering a payment (often for the full amount of the claim, plus an amount for attorneys' fees if an attorney was retained) that satisfies the customer.

82.     These advantages of pre-arbitration settlement are considerable, but were completely ignored by the study, despite the Chamber's having previously urged the Bureau to study pre-arbitration settlements to gain a fuller picture of arbitration's benefits. Letter from David Hirschmann & Lisa Rickard to Matthew Burton & PRA Office, *Re: "Telephone Survey Exploring Consumer Awareness of and Perceptions Regarding Dispute Resolution Provisions in Credit Card Agreements,"* Docket No. CFPB- 2013-0016 (Aug. 6, 2013), https://goo.gl/iJcScm ("Arbitration is virtually always accompanied by a prior process of mediation or informal negotiation * * * . Ignoring these successful uses of the non-litigation dispute resolution process will produce skewed and inaccurate results.").

83.     In addition to these omissions, the study was notably incomplete even as to cases where formal arbitration was initiated. Thus, a review of the study by two leading scholars noted critically that the Bureau neglected to collect data on the size of arbitral settlements—which are "the likely outcome in the majority of arbitrations that the CFPB studies," and a key factor in assessing arbitration's true benefits to consumers. Johnston & Zywicki, *supra*, at 6.

84.     In fact, a huge number of consumer claims are resolved before a customer

finds it necessary to invoke a formal arbitration agreement at all. The vast majority of those customer concerns are resolved through informal channels, such as customer service processes, negotiation, or mediation, before a concern ripens into a dispute and a formal arbitration demand is filed. Indeed, the Bureau's own complaint database shows that companies responded to more than 500,000 customer complaints in the past five years (a number that is rising each year), and approximately two-thirds of consumers who received a response did not dispute the company's resolution. Consumer Fin. Protection Bureau, *Consumer Response Annual Report* (2016) at 46-47, https://goo.gl/wcVVk0 (stating that 65% of consumers "did not dispute the response during the feedback period" and another 14% did not provide feedback); Consumer Fin. Protection Bureau, *Consumer Response: Complaints By the Numbers*, https://goo.gl/8wNRcY (indicating that the CFPB had handled 558,000 complaints as of March 1, 2015).

      85.    The study also wholly failed to examine whether arbitration provides a way for consumers to obtain relief for claims that could not be brought in either individual lawsuits or class actions. The Bureau's Consumer Complaint Database reflects that consumers' claims against providers of consumer financial products and services are generally small: the median amount paid by companies to resolve claims was just $130. Consumer Fin. Protection Bureau, *Consumer Response Annual Report* (2016) tbl. 16, https://goo.gl/wcVVk0. Claims of this size are far too small to justify paying a lawyer to handle the matter—and without a lawyer, a consumer has no hope of bringing a successful court case.

      86.    Nor could most of these claims be resolved in class litigation. The Chamber conducted a review of claims in the database, and found that more than 90% of narratives submitted involved individualized issues (most commonly inaccuracies on a credit report or attempts to collect a debt that either had been paid or was not owed) that likely would not be suitable for resolution in a class or collective action. *See* Letter from David Hirschmann & Lisa Rickard to Monica Jackson, Office of the Exec. Sec'y, CFPB (Aug. 22, 2016), at 13. The study should have examined whether, without arbitration, consumers could hope to recover on such claims against businesses. But it did not.

87.     The study's methodological flaws, disregard of materially relevant evidence, and failure to consider key issues undermine the validity of its judgment about the fairness, efficiency, and efficacy of arbitration as a mechanism for resolving consumer disputes.

**B.     The Study Incorrectly Concluded That Class Actions Are An Effective Means Of Obtaining Relief For Consumers**

88.     The study also reached defective conclusions on the other side of the equation: it both greatly overstated the value of class actions as a mechanism for obtaining consumer relief and misstated the comparative effectiveness of class-action litigation as opposed to arbitration.

89.     In touting the efficacy of class-action litigation, the study found that over the five-year period studied, 34 million consumers received a total of $1.1 billion in payments from class-action settlements. *See* Final Study § 8, at 27. The study then compared this amount with the aggregate individual recovery in arbitration cases resolved on the merits from 2010 to 2012, which the study identified as $172,433 awarded to thirty-two consumers. *Id.* § 5.6.6, at 41. Looking at these comparative figures from the study, the Bureau concluded, "precluding providers from blocking consumer class actions * * * would better enable consumers * * * [to] obtain redress." 81 Fed. Reg. 32,861.

90.     This contrast, however, does not support the Bureau's conclusion. It compares arbitration awards *on the merits* to class-action *settlements*. This apples-to-oranges comparison is wholly non-probative. As the two scholars who reviewed the Bureau's study noted, "[h]ad the CFPB made a proper * * * data comparison, it would have compared consumer recovery in successful consumer arbitrations not to class-action settlements but to the 2% of consumer class actions in which consumers got an individual or classwide judgment." Johnston & Zywicki, *supra*, at 50. This failure had a material effect on the Bureau's conclusion. By ignoring arbitral settlements, the study likely excluded consideration of the strongest arbitration claims that produced the highest recoveries; it is reasonable to assume that defendants settle the stronger arbitral claims rather than take them to judgment.

91.     The Bureau's comparative conclusion also is wrong for another reason. Its

own data show that, when comparing arbitral judgments to class-action settlements, individuals come out ahead in arbitration: the average arbitral result gave individual consumers substantially more relief ($5,389) than the average payment to individuals following a class-action settlement ($32.35). *See* Final Study § 5.6.6, at 41; *id.* § 8, at 33.

92.     Moreover, the Bureau's aggregated class-action damages figure is misleading on its own terms, for several reasons. For one thing, a disproportionate amount of this "$1.1 billion" is attributable to a single set of class actions, the *In re Checking Account Overdraft Litigation* cases, which is an outlier example not typical of most class actions. *See* Final Study § 8, at 40. Consequently, the study relied on aggregate averages that "tend[] to overweight data from only half a dozen huge class action settlements." Johnston & Zywicki, *supra*, at 7. For another, although the $1.1 billion figure sounds large in the abstract, it was spread among 34 million class members; as noted above, this means that the average settlement payment to class members benefiting from these class-action settlements was little more than thirty dollars, a paltry sum when compared to the average attorneys' fee awarded in these cases—approximately $1 million per case. *See* Final Study § 8, at 33.

93.     And finally, focusing on the aggregate amount of damages in a few selected class actions obscures the fact that most consumers who are members of class actions never recover a penny. The Bureau found that 87% of resolved class actions (which does not include any claims affected by arbitration agreements) resulted in *no* benefit to absent class members because the actions were either dismissed by the court or settled with the named plaintiff only; just 13% of class actions were settled on a classwide basis. *See id.* § 6, at 37. Even as to these, the study found that in class actions that *did* settle on a classwide basis, the "weighted average claims rate"—that is, the rate at which class members actually submitted claims to receive payment—was just 4%. *See id.* § 8, at 30. That the overwhelming majority of class members did not find it worth their while even to claim the settlement benefits to which they were entitled demonstrates the minimal value of most consumer class-action recoveries.

94.     Given that the overwhelming majority of class actions produce no benefit

for *any* absent class members, and that few consumers even bother to file claims when a classwide settlement is reached, the Bureau should have examined whether the benefits of the class-action system are worth its massive costs. But it did not do so, a failure that substantially undermines the validity of its conclusions.

### C.    The Study Incorrectly Concluded There Was No Evidence That Arbitration Leads To Lower Prices For Consumers

95.    The study concluded that arbitration did not lower prices for consumers by examining one particular series of settlements, in *Ross v. Bank of America*, in which certain credit card issuers agreed not to include arbitration agreements in their card agreements for a period of three-and-a-half years. The Bureau looked for "statistically significant evidence, at standard confidence level (95%), that companies that eliminated arbitration raised their prices (measured by total cost of credit) in a manner that was different from that of comparable companies that had not changed their policies regarding arbitration provisions." Final Study § 10, at 5-6. It found no such evidence, leading to its conclusion that arbitration does not lead to lower consumer costs.

96.    But that analysis has serious flaws. For one thing, although the study uses scientific-sounding jargon—describing the settling credit card issuers as a "treatment group" and other issuers as a "control group"—the Bureau acknowledged that the "control group" "may or may not have used pre-dispute arbitration provisions" at all. *See* Final Study § 10, at 8. This means that there was no control group as that term is commonly understood—a flaw in the Bureau's case study that renders its conclusions worthless.

97.    The Bureau also was incorrect to assume that issuers who agreed to the arbitration moratorium would be certain to raise prices if arbitration had previously produced cost savings for them that were lost due to the moratorium. As the scholarly critique of the Bureau's study explained, it is "hardly surprising" that no price change occurred, given that the institutions involved in the case were large banks: "it is known that firms in the consumer services sector adjust prices much more slowly in response to cost changes than do firms in the manufacturing sector and that large firms adjust prices more slowly than do small firms." Johnston & Zywicki,

- 29 -

*supra*, at 33-34. The scholars also point out that "the moratorium was only temporary. There is neither theoretical nor empirical reason to have thought that such a temporary change in costs would change credit card pricing." *Id.* at 34. And they note that the Bureau looked only at the year immediately after the moratorium began—an odd choice given that "no evidence indicates that financial services prices respond so quickly even to a permanent change in costs and no sound theoretical reason exists to think that they would." *Id.*

98.     Equally troubling, the Bureau never assessed whether issuers that used arbitration agreements *during the time frame studied* actually had experienced any cost savings from the use of arbitration—and if there were no cost savings during that time, there would be no reason for increasing prices when arbitration was eliminated. Yet, although use of arbitration produces cost savings *now*, given the state of the law during the period studied by the Bureau, it is unlikely that businesses were experiencing cost savings from the use of arbitration at that time. Specifically, the Bureau purported to examine the total cost of credit (a defined term subject to its own limitations) with a "before" period from November 2008 to October 2009 and an "after" period from January 2010 to November 2011. Final Study § 10, at 9-10. This means that the Bureau largely limited its consideration to the period before the Supreme Court decided *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), in April 2011—that is, when arbitration clauses were routinely not being enforced in a number of magnet jurisdictions for consumer class actions (including California, New Jersey, Illinois, Missouri, and Washington State). When courts do not enforce arbitration agreements and allow class-action lawsuits to proceed, it is self-evident that companies that are party to an arbitration agreement will not experience reduced transaction costs from arbitration.

99.     Accordingly, the Bureau's analysis sheds no light on whether companies experience cost savings from arbitration and pass those savings on to consumers. Common sense and economic theory, by contrast, establish that they do. As one scholar put it, "it is inconsistent with basic economics to question the existence of the price reduction[s]" that arbitration makes possible. *See* Stephen J. Ware, *The Case for Enforcing Adhesive Arbitration Agreements—With*

*Particular Consideration Of Class Actions and Arbitration Fees*, 5 J. Am. Arbitration 251, 256 (2006). The Bureau erred when it relied on defective statistics to dismiss that basic principle of economics.

> **D.    The Study Failed To Assess Several Other Important Issues That Are Central To The Regulation Of Arbitration**

100.    In addition to the errors in the analysis that the Bureau did conduct, the final study simply failed to consider certain important aspects of arbitration at all.

101.    The Bureau did not assess what impact a ban on enforcing pre-dispute class waivers in arbitration agreements would have on providers' willingness to make arbitration available to their customers. In fact, the practical effect of such a bar would be to bring about the end of *all* consumer arbitration in the financial services sector.

102.    A company that sets up an arbitration program incurs significant administrative costs in connection with carrying out arbitrations—costs that the company does not incur in connection with taxpayer-funded judicial litigation. Companies will be unwilling to expend these resources and set up an effective, consumer-friendly arbitration system unless they know it will save them the transaction costs of litigating in court—particularly of litigating class actions, which are especially expensive to defend. Thus, if a company is faced with the prospect of maintaining an arbitration system and simultaneously having to confront judicial class-action litigation, the rational response will be to reduce overall transaction costs, and the most efficacious way to do that will be to eliminate the arbitration system altogether.

103.    As a threshold matter, the benefits of establishing and maintaining an arbitration program will be lost without sufficient participation by customers. If pre-dispute agreements to arbitrate are barred, businesses will have no assurance that any substantial number of disputes will in fact be resolved by arbitration. Businesses could not be expected to initiate or maintain expensive arbitration programs that depend for their success on such speculative outcomes. And once a dispute arises—if the Rule mandates the availability of class-action litigation—businesses are very unlikely to make available the current, highly pro-consumer arbitration regime, in which the company typically pays filing fees, attorneys' fees, arbitration

costs, and (often) a premium if the customer does better in arbitration than the company's last settlement offer.

104.    That is especially so because academic research consistently demonstrates that post-dispute agreements to arbitrate "amount to nothing more than a beguiling mirage"—they simply don't exist in the real world. Theodore J. St. Antoine, *Mandatory Arbitration: Why It's Better than It Looks*, 41 U. Mich. J.L. Reform 783, 790 (2008). Once a dispute has arisen, it is highly unlikely that the parties will opt for arbitration, for several reasons. At that point, the parties will frequently have trouble evaluating the strength of their cases objectively. They also will be reluctant to suggest arbitration as an alternative to litigation to avoid the appearance that they question the strength of their position. These psychological factors will make it difficult for one or both parties to agree to arbitrate rather than take their chances in court. Lawyers for both sides also have incentives to encourage their clients to opt for litigation in court rather than arbitration, and cannot realistically be expected to abandon lawsuits that already have been initiated. *See* Steven C. Bennett, *The Proposed Arbitration Fairness Act: Problems And Alternatives*, 67 Disp. Resol. J. 32, 37 (2012); Lewis L. Maltby, *Out of the Frying Pan, Into the Fire: The Feasibility of Post-Dispute Employment Arbitration Agreements*, 30 Wm. Mitchell L. Rev. 313, 326-27 (2003); David Sherwyn, *Because It Takes Two: Why Post-Dispute Voluntary Arbitration Programs Will Fail to Fix the Problems Associated with Employment Discrimination Law Adjudication*, 24 Berkeley J. of Emp. & Lab. L. 1, 69 (2003).

105.    It follows that a rule prohibiting the enforcement of class waivers will have the effect of stopping companies from offering arbitration to their customers—depriving those consumers of the only effective means of seeking relief for the vast majority of claims that cannot feasibly be brought as either class actions or individual lawsuits. The study simply ignored this possibility.

106.    Nor did the Bureau investigate whether class actions are needed to deter wrongdoing by businesses in light of the actions taken by the Bureau and other regulators to enforce federal consumer financial laws. The Bureau, for example, brought more than 120 public

enforcement actions through the end of 2015, producing *$11.2 billion* in consumer payments—more than the aggregate amount that the Bureau found had been recovered in class-action settlements during the five-year period that it studied. *See* Christopher Peterson, *Consumer Financial Protection Bureau Law Enforcement: An Empirical Review* 21-22 (2016), https://goo.gl/DPz6bu. The Bureau also has used its supervisory authority to conduct hundreds of examinations of providers. *CFPB Supervisory Highlights*, Spring 2014, at 5, https://goo.gl/nYC1A2 ("In 2013, the CFPB conducted over one hundred supervisory activities—such as full scope reviews and subsequent follow-up examinations—and plans to conduct approximately 150 of these activities in 2014."). The Bureau likewise provides a forum in which consumers can file complaints against financial institutions; its website touts that to date, the CFPB has handled more than 1.2 million consumer complaints and gotten timely responses to 97% of them. *See* https://www.consumerfinance.gov/ (last visited Aug. 6, 2017). These enforcement actions are amply sufficient to deter wrongdoing.

107.    By contrast, class actions are not a reliable mechanism for the deterrence of business misconduct. Plaintiffs' lawyers have no institutional interest in enforcing consumer protection laws; their interest is in maximizing their own income. Thus, in selecting cases to pursue, class-action lawyers look principally for those in which a complaint can be written that simply will survive a motion to dismiss. These lawyers know that defendants have a strong incentive to settle any class action that is not dismissed, irrespective of the suit's merits, because gigantic defense costs coupled with massive potential liability makes going to trial too risky. As a result, "many corporate defendants view class judgments and settlements as a cost of doing business, subsidized by insurers or passed along to consumers." Linda Mullenix, *Ending Class Actions as We Know Them: Rethinking the American Class Action*, 64 Emory L.J. 399, 415 (2014); *see Concepcion*, 563 U.S. at 350 ("when damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims. Other courts have noted the risk of 'in terrorem' settlements

that class actions entail, see, *e.g., Kohen v. Pacific Inv. Management Co. LLC,* 571 F.3d 672, 677–678 (C.A.7 2009)"); *Matter of Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995) (noting Judge Friendly's characterization of "settlements induced by a small probability of an immense judgment in a class action [as] 'blackmail settlements'") (Posner, J.). These companies face little reason to alter their behavior by virtue of the existence of class actions.

108.    For this same reason, the simple fact of class-action settlements, standing on its own, does not establish the existence of corporate wrong-doing that was remedied, or could be prevented, by class-action litigation. Defendants settle many class actions that are not meritorious, to avoid the risk of a massive adverse verdict at trial and knowing that the costs of settlement can be passed on to others. Absent a determination by the Bureau that the claims asserted in the settled class actions it identified in its study *actually* had merit—a determination that the Bureau did not even attempt to make—its suggestion that class-action litigation deters wrongdoing and its observation that class-action settlements led defendants to agree to change their business practices (*see* Final Study § 8, at 17) have no salience.

109.    The study should have examined whether class actions truly deter wrong-doing and whether whatever deterrent effect they have is duplicative of the effect of enforcement actions by the Bureau and other regulators. But it did not.

110.    The study also suffers from other significant omissions. Thus, the study took an unthinking one-size-fits-all approach, failing to address the differing considerations presented by varying industries and products covered by the Rule, which are subject to divergent statutory structures and pose widely differing circumstances. Yet the study did not undertake to address the specific conditions and public interest balance presented by particular financial products and services, instead focusing almost exclusively on credit cards and similar services and assuming that all other "covered products and services" present the very same considerations without any examination of that question. As the comments submitted regarding the proposed rule demonstrate, that assumption was wrong. This error is yet another reason why the study falls far short of what Congress required.

111.    Nor did the Bureau address the potential problem of over-deterrence, by which the threat of draconian liability might lead to certain lawful and beneficial products being removed from the market entirely. To the contrary, the Bureau declined to address public benefits and costs with respect to particular products and services, instead addressing only whether the Rule "as a whole * * * promote[s] the public good and protection of consumers." 82 Fed. Reg. at 33,337.

112.    And the study made no effort to address the special challenges facing startups and small businesses, as to which the availability of arbitration may be particularly important. Expensive and burdensome class-action liability could be ruinous for such companies, possibly driving them out of business and posing the risk that consumers will not be able to benefit from certain innovative new enterprises and products at all.

113.    Finally, the study made no serious effort to *weigh* the competing costs and benefits of effectively eliminating arbitration. It overestimated the benefit of class actions in protecting consumers and underestimated the massive transaction costs involved in producing whatever limited benefit class actions yield. The Bureau acknowledged that the Rule will lead to increased class-action litigation (and hence more class-action settlements), 82 Fed. Reg. at 33,403, but rather than recognize the strong likelihood that the cost of this additional litigation will be passed through to consumers, the Bureau unreasonably downplayed that prospect. The Bureau also placed significant weight on the purported (and unquantifiable) deterrent effect of class actions as a supposed benefit to consumers (*id.* at 33,410), dismissing the copious evidence that this deterrent effect does not exist. And the Bureau wrongly minimized (*id.* at 33,411) the likelihood that the Rule will cause businesses to abandon arbitration, depriving consumers of their only feasible means of obtaining relief for the overwhelming majority of small claims that cannot be advanced on a class basis. These serious errors and omissions in the Bureau's required cost/benefit analysis fatally undermine the Bureau's conclusions.

**The Arbitration Rule**

114.    Having completed its study, in May 2016 the Bureau published a notice of proposed rulemaking soliciting comments on a proposal to prohibit the use by "covered persons" of arbitration agreements that preclude class-action lawsuits. *See* Arbitration Agreements, 81 Fed. Reg. 32,830 (May 24, 2016) (the "Proposed Rule").

115.    As relevant here, the Proposed Rule "prohibit[ed] providers from using a predispute arbitration agreement to block consumer class actions in court and * * * require[d] providers to insert language into their arbitration agreements reflecting this limitation." 80 Fed. Reg. at 32,830. The Director approved the Proposed Rule prior to its issuance. *Id.* at 32,929.

116.    The Bureau completed its rulemaking process by publishing the final Arbitration Rule on July 19, 2017. *See* Ex. 1 (Arbitration Agreements, 82 Fed. Reg. 33,210 (July 19, 2017)).

117.    The Arbitration Rule, which grew out of the Bureau's study, categorically bars providers from relying on pre-dispute arbitration agreements in any way with respect to class-action lawsuits brought by consumers. *See id.* at 33,429 (to be codified at 12 C.F.R. § 1040.4(a)).

118.    The Arbitration Rule became effective on September 18, 2017 (Ex. 1 at 33,210), and applies to predispute arbitration agreements entered into on or after March 19, 2018. (*id.* at 33,430).

119.    The Director formally approved the Arbitration Rule. *Id.* at 33,434.

120.    The Bureau's issuance of the Arbitration Rule constitutes "final agency action" under 5 U.S.C. § 704.

121.    This pre-enforcement challenge to the Arbitration Rule is ripe for judicial review because the legal issues presented are fit for judicial resolution and because the Arbitration Rule requires an immediate and significant change in how providers conduct their affairs, with serious penalties attached to noncompliance.

122.    In the final Arbitration Rule, the Bureau maintains that prohibiting providers from relying on arbitration agreements to preclude class-action lawsuits is in the public interest and for the protection of consumers. Ex. 1 at 33,280.

123.    The Bureau acknowledges that the Rule would impose increased costs on providers, including in the form of increased litigation costs, and it acknowledges that some of these costs might well be passed on to consumers. *Id.*

124.    The Bureau concluded, however, that these burdens are justified because unleashing more class actions would "better enable consumers to enforce their rights * * * [and] obtain redress," and that this, in turn, would "strengthen the incentives for companies to avoid legally risky or potentially illegal activities." *Id.*

125.    The Bureau's conclusions on these issues rested on the results of its study, and were tainted by the study's flaws.

126.    The Bureau first concluded that a comparison between the efficacy of individual arbitration and that of individual litigation as means of vindicating consumers' rights is "inconclusive." *Id.* at 33,253. But the Bureau was able to reach that indeterminate conclusion only because the study failed to investigate whether consumers are capable of bringing small-dollar claims in individual lawsuits—which they are not. Arbitration, in contrast, provides an effective remedy for such claims. *See* ¶¶ 75-78, *supra*.

127.    Next, the Bureau concluded that arbitration is an "inadequate mechanism to resolve potential violations of the law that broadly apply to many customers of a particular company for a given product or service." Ex. 1 at 33,262. It supported this conclusion by pointing to the small number of claims resolved through individual arbitrations. *Id.* at 33,254. But that phenomenon is fully explained by the fact that the arbitration process gives companies an incentive to settle claims *before* an arbitration begins, which the study entirely failed to address. *See* ¶¶ 80-81, *supra*. The Bureau also noted the study's finding that few consumers said they would pursue a legal claim if they did not get redress for an injury from customer service. As a critique of the study pointed out, however, that is likely because "consumers prefer the market to

- 37 -

the legal response for perceived service failures by a credit card company. When a company does not resolve a dispute internally to the customers' satisfaction, consumers take their * * * business elsewhere." Johnston & Zywicki, *supra*, at 30. The study failed to consider that possibility.

128.    The Bureau likewise concluded that class actions are a more effective means than individual arbitration for obtaining relief for consumers. Ex. 1 at 33,273. But in reaching that conclusion, the Bureau relied on the study's calculations regarding the aggregate relief paid out to class members—which obscure the reality that most class actions result in *no* relief for class members at all. The Bureau's analysis also reflects the study's failure to appreciate that most consumer disputes simply cannot be raised in a class action because they involve individualized claims. *See* ¶ 86, *supra*. A rule that leads to the elimination of arbitration, which is the only means of resolving these small-value, individualized disputes, therefore will *decrease*, rather than increase, consumers' ability to obtain relief.

129.    The Bureau relatedly concluded that class actions are a superior means of ensuring that companies comply with the law. Ex. A at 33,297. But the study never examined whether class actions actually deter violations of the law, and there is reason to doubt that they do. *See* ¶¶ 107-08, *supra*.

130.    Finally, the Bureau asserted that public enforcement actions are not sufficient to assure compliance with federal consumer financial laws. Ex. A at 33,276. That conclusion, however, fails to assess the significance of the Bureau's own energetic enforcement activity, reflected in numerous enforcement actions that have yielded billions of dollars in relief for consumers. *See* ¶ 106, *supra*. The study simply ignored the question whether enforcement activity by the Bureau and other public agencies is adequate to deter violations of law, and the related question whether class-action litigation would add any meaningful degree of deterrence.

131.    In sum, the determinations underlying the decision to promulgate the Rule are arbitrary, capricious, and contrary to law.

132.    In addition, the failure to take account of differences between different types of "covered products and services," differences in the relevant markets, and differences in

potential liability and other consequences—and to create different standards and/or exceptions and exemptions, as appropriate—renders the Rule arbitrary and capricious and contrary to law.

**The Arbitration Rule Will Irreparably Harm Providers And Their Customers**

133.    Both providers of consumer financial products and services (including many of Plaintiffs' members) and consumers of those products and services will suffer immediate and irreparable harm if the Arbitration Rule is not preliminarily enjoined during the pendency of this action.

134.    The CFPB is authorized to seek a wide range of relief for purported violations of a rule or order prescribed under a federal consumer financial law. 12 U.S.C. § 5565. In particular, the Bureau may seek civil penalties of up to $1 million per day for each violation. *Id.* ¶ 5565(c)(2). Moreover, the cost of challenging the imposition of any sanctions as a means of contesting the Arbitration Rule's legality, and damages related those sanctions, would not be recoverable from the federal government because of its sovereign immunity. For these reasons, providers who believe that the Arbitration Rule is unlawful must comply or face crushing liability.

135.    Meanwhile, providers that do comply with the Arbitration Rule will incur substantial, long-lasting, and largely unrecoverable costs.

136.    *First*, providers will incur significant legal and compliance costs in adapting their businesses to the new rule. The Arbitration Rule will require providers to review and restructure their consumer financial contracts, re-train or hire new staff, modify their business practices, and expend legal and compliance resources to review and implement these changes. These developments will affect hundreds of millions of contracts, at great cost to providers. Given the enormous number of credit cards in the United States, for example, merely providing notice of change of terms to customers could cost providers millions of dollars.

137.    The vast majority of these costs will be wasted if the Arbitration Rule ultimately is deemed contrary to law. Indeed, in the event the Arbitration Rule is set aside by courts, providers will likely incur another set of transaction costs in returning to the status quo regime.

Moreover, because it takes months to implement necessary changes, providers must begin incurring these costs immediately as they prepare for the Rule's impact on contracts entered into on or after March 19, 2018.

138.    *Second*, as a practical matter, providers will be forced to forgo the significant benefits of arbitration, as the Rule takes effect and comes to govern all new agreements between covered businesses and consumers. Although the Arbitration Rule purports only to prohibit pre-dispute arbitration agreements, entry into a post-dispute arbitration agreement is not a realistic option, for the numerous reasons outlined above at ¶ 104.

139.    *Third*, providers will be subjected to increased class-action liability. As explained above, *see supra* ¶¶ 107-08, plaintiffs' lawyers often bring class actions that lack substantial merit; liability functions more as a tax on business than as a deterrent to wrongdoing. Because lawyers will know that covered persons are unable to enforce class waivers, providers will be likely to face, and be forced to defend or settle, many more class actions even just during the period while this case is pending. And once classes are certified in such cases, it will be impossible for the classes to be decertified or the cases resolved on a non-class basis even if the Arbitration Rule is later set aside, meaning that Plaintiffs' members will be subjected to the very substantial expenses of coerced settlements and class litigation. That will result in those companies absorbing significant litigation expenses that they now avoid through the arbitration mechanism.

140.    *Finally*, providers are likely to be stuck with these harms for many years to come as to at least some customers. There currently are hundreds of millions of consumers of financial products and services who are parties to agreements containing arbitration clauses. Even if this action proceeds expeditiously, so long as the Arbitration Rule remains in effect it is likely that, while the case is pending, millions of additional consumers will enter into new contracts with Plaintiffs' members that do not contain arbitration clauses (or that many current customers will enter into new contracts with those businesses). These contracts will thereafter be binding on providers whether or not the Rule is set aside. Although businesses may attempt to

change their agreements with such customers to provide for arbitration if the Rule subsequently is invalidated, thus returning to the pre-Rule terms of service, some customers who would have entered into pre-dispute arbitration agreements had such terms been permitted initially may be unwilling to do so later, or may be more willing to opt out of arbitration agreements in those circumstances.

141.    These harms will not be limited to businesses covered by the Arbitration Rule. They will also injure consumers, who will pay many of the increased costs indirectly through higher prices, less attractive products and terms of service, and reduced competition. Indeed, according to the CFPB's own figures, the Final Rule will cause financial services providers to incur billions of dollars in additional costs over a five-year period as a result of thousands of additional class-action lawsuits. 81 Fed. Reg. 32,907-09. Those numbers are expected to be repeated every five years. This rise in litigation costs is likely to be passed through to consumers, in the form either of higher prices and/or reduced services. 82 Fed. Reg. 33,302. And insofar as the Rule leads to the elimination of arbitration as a mechanism for resolving individual disputes, it will leave many consumers with no real remedy for these claims against providers of financial products and services.

## CAUSES OF ACTION

### COUNT I:
### The Arbitration Rule Is *Ultra Vires* Because The Bureau Is Unconstitutionally Structured

142.    Plaintiffs repeat and reallege paragraphs 1-141 as if set forth fully herein.

143.    Pursuant to 5 U.S.C. § 706(2)(B), a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * contrary to constitutional right, power, privilege, or immunity."

144.    Article II of the Constitution vests all of the Federal Government's executive power in the President of the United States. *See* U.S. Const. art. II, § 1, cl. 1. It is unconstitutional for Congress to vest executive power in officers who are not removable by, and hence not accountable to, the President. *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 119 (1926).

145.    The Supreme Court has relaxed the requirement that the President be freely

- 41 -

able to remove subordinates only in the case of independent agencies headed by bipartisan, multimember bodies (such as the Federal Trade Commission), on the theory that these agencies "cannot in any proper sense be characterized as an arm or an eye of the executive." *Humphrey's Executor v. United States*, 295 U.S. 602, 632 (1935). That rationale does not apply to the Bureau, which is headed by a single individual rather than a bipartisan, multimember body.

146.    Historical practice confirms that the concentration of executive power in a single, unaccountable Director of the Bureau violates Article II of the Constitution. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) ("Perhaps the most telling indication of [a] severe constitutional problem [is] * * * the lack of historical precedent for [an] entity." (quotation marks omitted)).

147.    Only three other independent agencies—the Social Security Administration, the Office of Special Counsel, and the Federal Housing Finance Agency (FHFA)—are headed by single individuals removable only for cause. But the FHFA was created about the same time (2008) as the Bureau and cannot provide a historical precedent for the Bureau's structure. *See PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d at 20. The other two agencies, meanwhile, "do not exercise the core Article II executive power of bringing law enforcement actions or imposing fines and penalties against private citizens for violation of statutes or agency rules," and thus are "different in kind from the" Bureau. *Id.* at 18. In short, "there is no settled historical practice of independent agencies headed by single Directors who possess the substantial executive authority that the Director of the CFPB enjoys. The CFPB is exceptional in our constitutional structure and unprecedented in our constitutional history." *Id.* at 21.

148.    The promulgation of the Rule itself demonstrates that the Bureau's constitutional defects are not merely technical or theoretical. The Bureau promulgated the Rule six months after the inauguration of a new President. That new President opposes the Rule—as evidenced by his Statement of Administration Policy urging Congress to invalidate the Rule under the Congressional Review Act.

149.    The Statement of Administration Policy issued by the current administra-

tion says:

> If allowed to take effect, the CFPB's harmful rule would benefit trial lawyers by increasing frivolous class-action lawsuits; harm consumers by denying them the full benefits and efficiencies of arbitration; and hurt financial institutions by increasing litigation expenses and compliance costs (particularly for community and mid-sized institutions). In many cases, these increased costs would be borne, not by the financial institutions, but by their consumers. The CFPB's rule is also in tension with the policy expressed by Congress in the Federal Arbitration Act, as recognized repeatedly by the Supreme Court, favoring resolution of disputes through arbitration. The Administration is committed to protecting Americans by making regulation efficient and effective and restoring public accountability within the Federal financial regulatory agencies as outlined in Executive Order 13772, *Core Principles for Regulating the United States Financial System*. This legislation would protect consumer choices by eliminating a costly and burdensome regulation and reining in the bureaucracy and inadvisable regulatory actions of the CFPB.

*Statement of Administration Policy – H.J. Res. 111 – Disapproving the Rule, Submitted by the Consumer Financial Protection Bureau, Known as the Arbitration Agreements Rule* (July 24, 2017), https://goo.gl/LW5W46.

150.     But because of the extraordinary structure given the CFPB and the unusual powers given the CFPB's Director by the Dodd-Frank Act, the President cannot prevent the Rule from being promulgated, or even appoint one or more commissioners who might produce a different outcome.

151.     The provision of the Dodd-Frank Act that is most responsible for this constitutional defect is 12 U.S.C. § 5491(c)(3), which makes the Director removable only for cause. The Director's insulation from all accountability to the President was a central part of Congress's design for the Bureau: Congress repeatedly emphasized that feature of the Bureau as critical to the structure it envisioned for the agency and as having a significant impact on the Bureau's actions. *See, e.g.*, 12 U.S.C. § 5491(a) (creating an "independent bureau"); S. Rep. No. 111-176, at 174 (identifying the CFPB as a "strong and independent Bureau"); 156 Cong. Rec. E1262 (July 1, 2010) (Rep. Jackson Lee) ("One of the strongest provisions * * * in this legislation is the formation of an independent Consumer Financial Protection Bureau"); 156 Cong. Rec. H5239 (June 30, 2010) (Rep. Maloney) ("[The Bureau] will be completely independent, with an inde-

pendently appointed director."); 156 Cong. Rec. H5214 (June 30, 2010) (Rep. Castor) (calling the Bureau "a new independent watchdog"). There is, accordingly, substantial reason to believe that a constitutionally constituted CFPB would not have issued the Rule.

152.    Moreover, the Bureau is exceptional in its insulation from control by officials in either of the elected branches. In addition to the limits on the President's authority to remove the Director, the Bureau is substantially protected from oversight through exercise of the power of the purse by Congress, given the Director's authority to spend hundreds of millions of dollars annually without congressional or presidential approval. Here, too, this insularity likely led to the Bureau's notable unresponsiveness to members of Congress (including the chairs of the House committees of jurisdiction) during its conduct of the arbitration study; had the Bureau followed Congress's lead and been more receptive to comments during the study process, the study might well have had a different outcome.

153.    For all of these reasons, the structure of the Bureau contravenes Article II of the Constitution: The extraordinary limits on the people's ability to exercise their right to self-government through their elected officials that characterizes the Bureau's structure are unconstitutional. At a minimum, the Arbitration Rule promulgated by an unconstitutionally structured agency should be held unlawful, vacated, and set aside. An agency action, such as the Rule, that was promulgated by an agency under the direction of an officer who has unconstitutional statutory protection against removal from office by the President may not stand. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,* 561 U.S. at 513-14; *PHH Corp.,* 839 F.3d at 37-39. The Rule was the product of an agency decision-making structure that was unconstitutionally insulated from political review. The product of that structure—the Rule—necessarily is tainted by the agency's unconstitutional character and must be invalidated

### COUNT II:
### The Arbitration Rule Must Be Vacated Because It Was Issued Without Observance of Procedure Required by Law

154.    Plaintiffs repeat and reallege paragraphs 1-141 as if set forth fully herein.

155.    Pursuant to 5 U.S.C. § 706, a "reviewing court shall * * * hold unlawful

and set aside agency action, findings, and conclusions found to be * * * without observance of procedure required by law."

156. In the Dodd-Frank Act, Congress required the Bureau, prior to issuing any regulation, to conduct a study of arbitration and determine whether regulating or prohibiting arbitration in particular circumstances would be "in the public interest and for the protection of consumers." 12 U.S.C. § 5518(a)-(b).

157. Congress intended that this study be a fair-minded, methodologically rigorous examination of the merits of arbitration and litigation. But the Bureau's study fell far short of Congress's requirements. It was fundamentally flawed by methodological errors; misinterpreted or disregarded relevant information; and failed to consider key issues that bear on the inquiry.

158. For example, rather than fairly and impartially assess the benefits of arbitration (in particular, the incentive that arbitration gives businesses to settle nonfrivolous customer disputes), the Bureau misleadingly focused on the number of arbitrations that are decided on the merits—thus dramatically understating the value of arbitration for consumers.

159. By contrast, the Bureau *overstated* the value of class actions, focusing on the aggregate relief obtained in class actions over a certain time period. As a critique of this approach explained, "a very small number of large cases involving huge plaintiff classes are driving the [aggregate] results"—and "those cases are likely not typical of most class action cases." Johnston & Zywicki, *supra*, at 46.

160. Moreover, although the Bureau limited its analysis of arbitration to cases in which there was an arbitral *award*, it reported the relief obtained in class action *settlements*— setting up a "misleading comparison[] that tend[s] to bias rather than illuminate the public policy debate." *Id.* at 36.

161. The Bureau also relied on a methodologically flawed case study in an attempt to show that arbitration does not result in lower prices for consumers. The study lacked any conventional control group, rendering its observations about the pricing behavior of the companies studied completely non-probative. *See* ¶ 96, *supra*. There was also no reason to

expect that the companies in the case study would raise prices in response to the temporary elimination of arbitration, given the short length of the arbitration moratorium they accepted. *See* ¶ 97, *supra*.

162.     In light of its numerous "theoretical problems" and "technical failures," the case study sheds no light on whether arbitration lowers prices for consumers. Johnston & Zywicki, *supra*, at 34.

163.     In addition, the study also entirely fails to address significant considerations, among them whether a rule that mandates the availability of class-action litigation will lead to the elimination of arbitral dispute mechanisms and, if so, whether the net effect would be to injure, rather than benefit, consumers.

164.     For these and many other reasons, the Bureau's flawed study not only failed to answer, but was incapable of answering, the question whether restricting or prohibiting arbitration is in the public interest and for the protection of consumers.

165.     Because the Bureau did not comply with Congress's mandate to conduct an adequate and impartial study, its issuance of the Arbitration Rule was "without observance of procedure required by law," requiring vacatur of the rule. *See* 5 U.S.C. § 706(2)(D).

166.     In addition, the Dodd-Frank Act requires the Bureau to consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from" a proposed rule, as well as the impact of the proposed rule on smaller banks, savings associations, and credit unions. 12 U.S.C. § 5512(b)(2)(A).

167.     The Bureau's assessment of the potential costs and benefits of the Arbitration Rule is so inadequate that the Bureau was unable to undertake this assessment. For that reason as well, its issuance of the Arbitration Rule was "without observance of procedure required by law," requiring vacatur of the rule. *See* 5 U.S.C. § 706(2)(D).

**COUNT III:**
**The Arbitration Rule Is Arbitrary and Capricious**

168.     Plaintiffs repeat and reallege paragraphs 1-141 as if set forth fully herein.

169.    Pursuant to 5 U.S.C. § 706, a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

170.    The Arbitration Rule was based on a fundamentally flawed study, as set forth in Count II above. Given the errors and omissions that permeated the study on which the Arbitration Rule was based, the Bureau could not have reliably concluded that the Arbitration Rule was an appropriate exercise of agency discretion.

171.    The Rule is contrary to the evidence before the Bureau. The Bureau ignored significant theoretical and empirical evidence showing that arbitration is at least as fair as litigating in court, and much more efficient and accessible to consumers than is litigation.

172.    The Bureau also vastly overstated the fairness, timeliness, and value of class-action litigation to consumers, and it downplayed the harms of widespread class-action litigation to businesses and the economy generally. The primary beneficiaries of class actions are not consumers but lawyers. Indeed, the Bureau's own study confirms that in reality, class actions rarely, if ever, benefit class members.

173.    The Bureau likewise failed to consider important aspects of the problem. Among other omissions, it entirely failed to address the inevitable impact that the Arbitration Rule would have on the availability of arbitration, and therefore did not adequately address the fundamental policy question the Rule poses: whether the likely elimination of the only method for vindicating the individual claims that consumers most care about is justified by the interest in promoting class actions.

174.    The Bureau did not adequately consider the many possible alternatives short of a *de facto* ban on arbitration to address the issues identified in the Arbitration Rule. For example, the Bureau gave short shrift both to its own enforcement powers and to opportunities for coordination among individual claimants in arbitration. As Justice Kagan has observed, "non-class options abound" for vindicating claims in arbitration, including "informal coordination among individual claimants" or "amelioration of arbitration expenses." *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2318-19 (2013) (Kagan, J., dissenting).

175.    Because the Arbitration Rule's conclusions cannot be squared with the evidence before the Bureau, and because the Bureau failed to provide adequate explanations for the choices it made and for the plausible alternative approaches it rejected, the Bureau failed to engage in reasoned decisionmaking and, therefore, the Rule must be vacated and set aside.

## COUNT IV:
### The Arbitration Rule Is Contrary to Law Because It Is Not in the Public Interest and for the Protection of Consumers

176.    Plaintiffs repeat and reallege paragraphs 1-141 as if set forth fully herein.

177.    Pursuant to 5 U.S.C. § 706(2)(A), a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * not in accordance with law." Likewise, 5 U.S.C. § 706(2)(C), mandates that a court shall vacate and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

178.    Under the Dodd-Frank Act, the Bureau is authorized to prohibit or limit the use of predispute arbitration agreements if, and only if, "a prohibition or imposition of conditions or limitations [on predispute arbitration] is in the public interest and for the protection of consumers." 12 U.S.C. § 5518(b). The Bureau's findings on this issue must be "consistent with the study" required by the Dodd-Frank Act. *Id.*

179.    The Bureau's findings that the Arbitration Rule is in the public interest and for the protection of consumers cannot be squared with its study or with the copious evidence that arbitration provides consumers with a means of vindicating claims that could not be brought

in court.

180.    The vast majority of the claims that consumers have against providers of financial services cannot be raised in class actions because they turn on individualized facts. As a practical matter, these claims also cannot be brought in individual lawsuits because the amounts at stake are too small to justify the expense of litigation or to attract the interest of a plaintiffs' lawyer. These claims can, however, be resolved through arbitration, a mechanism that also allows consumers to proceed without lawyers and offers the opportunity to obtain relief with a modest expense of time and effort.

181.    The result of eliminating arbitration in favor of class actions will therefore be to deprive consumers of any means of obtaining redress for the vast majority of claims they are likely to have against providers of financial services. Such a result is neither in the public interest nor for the benefit of consumers.

182.    Although denying consumers the advantages of arbitration, the Rule provides no corresponding public benefits. Its primary effect will be to encourage wasteful class-action litigation. Such lawsuits very rarely produce material benefits for class members. But they routinely do result in enormous litigation expenses and strike-suit settlements that will, in substantial part, be passed on to consumers in the form of higher costs. The net effect will run counter to the public interest.

183.    The Bureau's conclusion that class actions protect consumers by deterring providers from engaging in unlawful conduct is wrong. Plaintiffs' lawyers often bring class actions against companies without regard for whether the defendant actually has engaged in unlawful conduct. Because businesses are targeted whether they violate the law or not, class actions give them no added incentive to comply with the law. Businesses' incentive to comply with the law instead comes principally from the threat that the Bureau or other law enforcement agencies will pursue enforcement actions.

184.    Because the final Arbitration Rule is neither "in the public interest" nor "for the protection of consumers" (12 U.S.C. § 5518(b)), the Rule departs from the mandate of

the Dodd-Frank Act and is "not in accordance with law" within the meaning of the Administrative Procedure Act. For this reason, too, the Rule is contrary to law and should be vacated and set aside.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Provide for expeditious proceedings in this action in light of the Arbitration Rule's effective date and its impending compliance date of March 19, 2018;

B.      Stay implementation of the Arbitration Rule pursuant to 5 U.S.C. § 705 or otherwise preliminarily enjoin the Director, his employees, and his agents from implementing and enforcing the Arbitration Rule in any respect, pending this Court's entry of a final judgment in this action;

C.      Enter final judgment in favor of Plaintiffs;

D.      Declare that the Arbitration Rule is unlawful because it is contrary to constitutional right, power, privilege, or immunity within the meaning of 5 U.S.C. § 706(2)(B); not promulgated by observance of procedures required by law within the meaning of 5 U.S.C. § 706(2)(D); arbitrary, capricious, or otherwise contrary to law within the meaning of 5 U.S.C. § 706(2)(A); and promulgated in excess of statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2)(C);

E.      Vacate and set aside the Arbitration Rule;

E.      Permanently enjoin the Director, his employees, and his agents from implementing or enforcing the Arbitration Rule; and

F.      Grant Plaintiffs such other relief as the Court deems just and proper.

Dated: September 29, 2017                    Respectfully submitted,


                              By:   _s/ Charles S. Kelley_

                                    Charles S. Kelley (Texas Bar No. 11199580)
                                    MAYER BROWN LLP
                                    700 Louisiana Street
                                    Suite 3400
                                    Houston, TX 77002-2730
                                    (713) 238-3000
                                    (713) 238-4888 (fax)
                                    ckelley@mayerbrown.com

                                    Andrew J. Pincus (DC Bar No. 370726; *pro hac
                                    vice* forthcoming)
                                    Archis A. Parasharami (DC Bar No. 477493; *pro
                                    hac vice* forthcoming)
                                    Kevin S. Ranlett (Texas Bar No. 24084922; *pro
                                    hac vice* forthcoming)
                                    MAYER BROWN LLP
                                    1999 K Street NW
                                    Washington, DC 20006
                                    (202) 263-3000
                                    (202) 263-3300 (fax)
                                    apincus@mayerbrown.com
                                    aparasharami@mayerbrown.com
                                    kranlett@mayerbrown.com

                                    *Counsel for Plaintiffs*

                                    Steven P. Lehotsky (DC Bar No. 992725; *pro hac
                                    vice* forthcoming)
                                    Warren D. Postman (DC Bar No. 995083; *pro hac
                                    vice* forthcoming)
                                    Janet Y. Galeria (DC Bar No. 1004542; *pro hac
                                    vice* forthcoming)
                                    U.S. CHAMBER LITIGATION CENTER
                                    1615 H Street, NW
                                    Washington, DC 20062
                                    (202) 463-5337
                                    (202) 463-5346 (fax)
                                    slehotsky@uschamber.com
                                    wpostman@uschamber.com
                                    jgaleria@uschamber.com

                                    *Counsel for Plaintiff Chamber of Commerce of the
                                    United States of America*